UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>EDMOND CHARRETTE,<br><br>Defendant. | Criminal No. 22-40001-MGM |

ORDER RE: MOTION FOR INVOLUNTARY
ADMINISTRATION OF ANTIPSYCHOTIC MEDICATION

January 7, 2025

MASTROIANNI, U.S.D.J.

I.    INTRODUCTION

The government requests that the court issue an order authorizing the Bureau of Prisons ("BOP") to forcibly administer antipsychotic medication to Edmond Charrette ("Defendant") in an attempt to restore his competency. Following an evidentiary hearing and oral argument, the court finds that the government has not satisfied its formidable burden under *Sell v. United States*, 539 U.S. 166 (2003), to override Defendant's "'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.'" *Id.* at 178 (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)).

The court also finds, in light of the denial of the forced-medication request, there is not "a substantial probability that in the foreseeable future [Defendant] will attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d). However, Defendant is still "subject to the [civil commitment] provisions of" 18 U.S.C. § 4246. *Id.*; *see also* 18 U.S.C. § 4246(a). A civil commitment proceeding against Defendant has already commenced in the Eastern District of North Carolina,

and this court expects that Defendant will be committed to the custody of the Attorney General for the foreseeable future.

## II.    BACKGROUND AND PROCEDURAL HISTORY

On January 20, 2022, Defendant was indicted on a charge of damage and destruction of a building and personal property by means of fire in violation of 18 U.S.C. § 844(i). (Dkt. No. 2.) The government alleges that on October 12, 2021, Defendant damaged and destroyed a restaurant, China City, in Leominster, Massachusetts by setting it on fire. Security camera footage from a neighboring business—admitted into evidence at both the detention hearing and the *Sell* hearing—shows Defendant drove to a strip mall plaza shortly before 3:00 a.m., exited the vehicle with a canister, broke the restaurant's window and entered with the canister, and then shortly thereafter jumped out of the same window on fire after a large explosion erupted from inside the restaurant. (Ex. A-6.)) Additional security camera footage from inside the restaurant shows Defendant pouring the contents of the canister on the floor inside the kitchen area. (Ex. A-5.) The Massachusetts State Police discovered Defendant after he was admitted to St. Vincent's Hospital for burns that same day. (Dkt. No. 31-1; Ex. A-18.) Defendant then transferred to Massachusetts General Hospital due to the extent of his injuries and was involuntarily hospitalized under Mass. Gen. Laws ch. 123, § 12 for ten days. (Dkt. No. 31-1; Dkt. No. 140 at 4; Ex. A-18; Ex. C at 14.)

Defendant originally retained as his attorney John L. Calcagni III, but counsel filed a motion to withdraw on February 28, 2022, on the grounds that Defendant "discharged him." (Dkt. No. 15.) Magistrate Judge David H. Hennessy granted the motion to withdraw on March 10, 2022, at which time Defendant expressed his desire to defend himself. (Dkt. No. 19.) Although Judge Hennessy sought to appoint Defendant a Federal Public Defender, he ultimately permitted Defendant to proceed *pro se*. (*Id.*) On March 23, 2022, Judge Hennessy held a detention hearing and ordered that Defendant be detained pending trial. (Dkt. No. 25.) At the detention hearing, the government raised

a question about Defendant's competency. (Dkt. No. 25.) On May 3, 2022, the government filed a Motion for a Hearing to Determine Mental Competency of Defendant. (Dkt. No. 31.) In support, the government noted that Defendant "appeared confused as to the nature of the proceedings" when the prosecutor attempted to conference with Defendant surrounding the detention hearing. (*Id.* at 2.) The government also pointed to Defendant's history of mental health commitments and refusals to sign medical waivers for Probation to monitor compliance with mental health treatment conditions of supervised release in *United States v. Edmond Charrette*, 21-cr-10188-WGY,[1] as well as "his behavior during the detention hearing." (*Id.*)

After a hearing, Judge Hennessy issued an Order for Competency Evaluation on June 2, 2022, finding "there is reason to believe Defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is able to understand the nature and consequences of the proceedings against him or to assist properly in his defense." (Dkt. No. 43 at 1.) Judge Hennessy explained that Defendant's "courtroom behavior provides a reason to believe he may not be competent," as he had "been disruptive during hearings" and "interrupted the court and counsel." (*Id.* at 2.) Judge Hennessy also explained that Defendant's *pro se* opposition to the government's motion to determine competency suggested he did not understand the nature of the competency proceedings, and he similarly appeared confused as to the nature of the detention hearing. (*Id.*) Judge Hennessy further pointed to Probation's report regarding a Pre-Sentence Report ("PSR"), prepared for Defendant's 2018 sentencing in the Western District of Texas, which stated that Defendant "was diagnosed with anxiety, depression, insomnia and antisocial disorder by military doctors at Fort Hood and was committed to Darnall Army Medical Center five times." (*Id.* at 3.) In

---

[1] On June 15, 2021, jurisdiction over Defendant's supervised release arising out of a conviction in the Western District of Texas transferred to this district and then was assigned to Judge William Young on July 19, 2021. *United States v. Edmond Charrette*, 21-cr-10188-WYG (Dkt. Nos. 1, 4.) On November 18, 2021, Magistrate Judge Jennifer Boal issued an Order detaining Defendant pending completion of a final hearing on revocation of supervised release in relation to the Leominster arson incident. *Id.* (Dkt. No. 26.)

addition, Judge Hennessy considered the nature of the alleged criminal conduct in Massachusetts and the prior conduct in Texas,[2] both of which suggested Defendant may be incompetent. Accordingly, Judge Hennessy ordered, pursuant to 18 U.S.C. §§ 4241(b) and 4247(b), that Defendant be committed to the custody of the Attorney General in order for a mental health professional to prepare a psychiatric report. (*Id.* at 5-6.)

On September 6, 2022, the undersigned[3] appointed Sean Smith as Defendant's attorney. (Dkt. No. 55.) Later, on February 17, 2023, after Attorney Smith was unavailable for a status conference, the court appointed Thomas J. O'Connor as Defendant's counsel.[4]

A.  Dr. Rigsbee's Competency Evaluation

On October 18, 2022, the Acting Warden of FCI Butner, where Defendant was placed for his competency evaluation, submitted the competency report, completed by Forensic Psychologist Justin Rigsbee, Ph.D. (Dkt. No. 70.) Defendant refused to cooperate in the competency evaluation, and he would not consent to the release of relevant mental health records. Instead, Dr. Rigsbee and staff observed Defendant and reviewed other records, including the 2018 PSR as well as BOP and Marshals Service records. Dr. Rigsbee also consulted with the prosecutor, Defendant's then-defense attorney (Sean Smith), and Defendant's Probation officers. The competency report recounted

---

[2] In the Western District of Texas, Defendant pled guilty to filing a false statement during purchase of a firearm in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2), filing a false statement in acquisition of a firearm in violation of 18 U.S.C. § 924(a)(1)(A), and knowingly making false entry on application or record in violation of 26 U.S.C. § 5861(l). Judge Alan Albright sentenced Defendant to 18 months incarceration and three years of supervised release. Probation reported that Defendant "provided false information in connection with the purchase of approximately" 62 firearms over a five-week span. (Dkt. No. 31-2 at 2.) Notably, regardless of the outcome of this criminal case, Defendant is prohibited from owning firearms because this court has found him mentally incompetent. *See United States v. Fieste*, 84 F.3d 713, 726 n.5 (7th Cir. 2023) (citing 18 U.S.C. § 922(g)(4)).

[3] On June 23, 2022, this case was reassigned from District Judge Timothy Hillman to the undersigned. (Dkt. No. 47.)

[4] Initially, the court appointed Attorney O'Connor as stand-by counsel, but at the March 20, 2023 competency hearing, the court found Defendant was not capable of representing himself and appointed Attorney O'Connor as Defendant's attorney. Defendant, however, has consistently refused, despite repeated attempts from both the court and his counsel, to communicate with or even acknowledge Attorney O'Connor. The court notes that Attorney O'Connor nevertheless zealously represented Defendant's interests throughout these proceedings.

Defendant's background, including that he was married in Nicaragua in 2011 and has two sons, and he had enlisted in the United States Army between 2011 and 2015. According to the 2018 PSR, Defendant was diagnosed with anxiety, depression, insomnia, and antisocial disorder by military doctors at Fort Hood in Texas in 2015; he was prescribed Celexa, Ambien, and Trazodone; and he had been committed to Darnall Behavior Therapy Health Hospital on five separate occasions. Following Defendant's arrest in 2018, during an interview with a psychologist at a BOP intake screening, Defendant reported that he had five hospitalizations in 2015 "all because of suicidal and homicidal ideation" and that he had considered "suicide bombing or shooting" and had attempted to hang himself in that same year. (*Id.* at 6.)

BOP records from 2018 and 2019 show various disciplinary infractions while Defendant was incarcerated at FMC Devens, including for urinating in his cell, refusing to obey orders, and interfering with security devices. Defendant was placed on suicide watch precautions on two occasions and often refused to engage with prison staff for extended periods of time. Defendant also exhibited strange behavior and made concerning comments, including nudity, spreading feces around his cell, stating that his food was poisoned, and writing the word "radiation" on his cell wall and scratching the word "PACE" on his forehead. (*Id.* at 6-10.) Defendant reportedly claimed he had an implant in his chest, and on another occasion stated, "his most recent telephone calls with his wife were actually with artificial intelligence, only to later say that the BOP had used records of his phone calls with his wife to fabricate his recent phone calls." (*Id.* at 9-10.) In 2019, while incarcerated at FMC Devens, Defendant was assigned a diagnosis of antisocial personality disorder.

In September of 2022, after Defendant arrived at FCI Butner for his competency evaluation, he refused to answer any intake questions and generally declined to engage with Dr. Rigsbee, despite multiple attempts. Defendant did interact with correctional staff, but he refused to stop covering his cell's window and security cameras and received disciplinary infractions. Dr. Rigsbee also noted that

Defendant refused to speak with his recently appointed counsel (Sean Smith), abruptly hanging up the phone on him "upon being informed of whom he would be speaking with at the time." (*Id.* at 16.) However, Dr. Rigsbee reported that "there was no evidence of psychotic symptoms during the evaluation period," and Defendant "did not appear to be responding to internal stimuli, nor did he verbalize delusional thought content." (*Id.* at 13.) Dr. Rigsbee also opined that Defendant "did not display clinical symptomatology consistent with a severe mental illness (i.e., psychosis) during the current evaluation period," and "[t]here were no observed or otherwise noted instances of disorganized speech/thought, auditory and/or visual hallucinations, negative symptoms (i.e., anhedonia), or disorganized or catatonic behavior." (*Id.* at 15.) Dr. Rigsbee assigned Defendant a diagnosis of other specified personality disorder, with antisocial features, but this was due to the absence of evidence of "conduct disorder" prior to the age of 15, which is required for a formal diagnosis of antisocial personality disorder. Nevertheless, Dr. Rigsbee explained that Defendant "otherwise exhibits diagnostic features of Antisocial Personality Disorder," such as "a failure to conform to social norms with respect to lawful behavior" and "a tendency to behave impulsively given his decisions to act out in a fashion that does not take into account his own best interests." (*Id.* at 14-15.) While acknowledging the limitations of his evaluation (given Defendant's refusal to participate), Dr. Rigsbee ultimately opined that Defendant was competent to proceed to trial.

B.  Competency Hearing and Transportation Issues

The court, for its part, has had its own difficulty arranging for the transportation and/or appearance of Defendant for court proceedings. After receiving Dr. Rigsbee's competency report, the court held a status conference on November 15, 2022, but the Clerk's Office received notification from the Wyatt Detention Facility, where Defendant had been transferred, that he refused to attend the remote video conference. (Dkt. No. 57.) On December 19, 2022, the court had scheduled a status conference for the Springfield courthouse, but it was informed that Defendant

refused to physically leave the detention facility to attend the court hearing, so the court converted the status to a Zoom hearing which Defendant refused to participate in. (Dkt. Nos. 59, 61, and 65.) On February 2, 2023, the court held a status conference in the Worcester courthouse, and it was again informed that Defendant refused to physically leave the detention facility to attend the hearing. (Dkt. No. 71.) On February 3, 2023, as discussed at the prior status conferences, the court issued the first of many sealed orders authorizing minimal use of force against Defendant in order to accomplish the transportation of Defendant to the court for hearings. (Dkt. No. 72; *see also* Dkt. Nos. 83, 152, 163.) The court understands that despite the authorization to use some amount of force, if necessary, against Defendant, Marshals Service and BOP personnel generally have not had to do so, as the mere threat of force (coupled with court authorization) has sufficed to compel Defendant's compliance or mere passive resistance.

On February 15, 2023, the court held a status conference in the Springfield courthouse. (Dkt. No. 73.) Defendant refused to sit at the counsel table until Attorney O'Connor moved and sat in the audience-section of the court; later, Defendant sat on the floor. Defendant briefly engaged with the court but fixated on his belief that he had already pled guilty before Judge Hennessy and was in the sentencing phase.

On March 20, 2023, the court held a competency hearing for the purpose of assessing Defendant's competency "to understand the nature and consequences of the proceedings against him [and] to assist properly in his defense." 18 U.S.C. § 4241(d). At the hearing, the court engaged in an extended colloquy with Defendant regarding his understanding of the status of his criminal case. Again, Defendant displayed an irrational fixation on his belief that he previously pled guilty before Judge Hennessy, despite repeated explanations from the court to accept that no such guilty plea had occurred and that the court needed to assess Defendant's competency before he could proceed to the next stage of this case. Defendant also displayed peculiarities in his affect, demeanor, and speech

patterns at the competency hearing, as well as an inability to focus on the matter at hand. The court additionally heard testimony from Dr. Rigsbee, who had the opportunity to observe Defendant's extended colloquy with the court. However, as noted in the court's Order Re: Competency, "Dr. Rigsbee's opinion did not appear to be significantly influenced by Defendant's behavior at the hearing, which Dr. Rigsbee believed was rigid, but not delusional." (Dkt. No. 86 at 4.)

The court, in its March 22, 2023 Order Re: Competency, rejected Dr. Rigsbee's assessment and found "Defendant's behavior and thinking went well beyond rigid and appeared at least semi-delusional." (*Id.*) The court also found "that Dr. Rigsbee's failure to analyze and account for the extreme behavior Defendant displayed at the competency hearing and adjust or explain his opinions in any meaningful way significantly undermines Dr. Rigsbee's reliability," and the court gave "no credit to Dr. Rigsbee's methodology or conclusion that Defendant is competent." (*Id.* at 4-5.) The court ultimately found that Defendant was "suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." (*Id.* at 1 (citing 18 U.S.C. § 4241(d)).) The court therefore committed Defendant to the custody of the Attorney General, under 18 U.S.C. § 4241(d)(1), for the purpose of determining whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward.

On December 15, 2023, after multiple status report updates from the government explaining that Defendant was on a waitlist for placement in a suitable facility, the court issued an order authorizing minimal force to screen Defendant for tuberculosis (which he had been resisting) and transport him to FMC Butner, so that Defendant would not lose his long-awaited spot for restoration treatment. (Dkt. No. 116.)[5] Defendant arrived at FMC Butner on January 2, 2024.

---

[5] The court also issued orders authorizing the disclosure of Defendant's medical and mental health records to FMC Butner medical professionals. (Dkt. Nos. 124, 125.)

C.  Dr. Sharf's Competency Evaluation

On April 30, 2024, the Warden of FMC Butner submitted a forensic evaluation completed by Forensic Psychologist Allyson Sharf, Ph.D. (Dkt. No. 133.) Dr. Sharf recounted the background information contained in Dr. Rigsbee's report, largely drawn from the 2018 PSR and BOP and Marshals Service records. However, Dr. Sharf also had access to additional records which were not available to Dr. Rigsbee, including court transcripts and medical records from Massachusetts General Hospital, St. Vincent Hospital, and the Carl. R. Darnall Army Medical Center. Dr. Sharf reviewed those medical records, starting with records from the Darnall Army Medical Center from 2015, which show Defendant obtained outpatient and inpatient mental health services between 2014 and 2015. (*Id.* at 11; Ex. D.) Dr. Sharf explained that Defendant

> was diagnosed with a variety of mental health disorders, though such diagnoses were typically related to mood symptoms (e.g., adjustment disorder with anxiety and depressed mood, adjustment disorder with depressed mood, adjustment disorder with disturbance of emotions and conduct, adjustment disorder with mixed emotional features, depression, mood disorder in conditions classified elsewhere, "highly irritable"), personality pathology (e.g., "cluster B personality disorder"), or substance use (e.g., alcohol abuse).

(Dkt. No. 133 at 11.) Defendant "was routinely prescribed Celexa 'for anxiety depression' and Trazadone 'for insomnia,' though prescriptions for haloperidol and lorazepam were also noted."

(*Id.*) Moreover, Defendant was psychiatrically hospitalized on four occasions during this time period for suicidal and/or homicidal ideation. Specifically, Dr. Sharf noted:

> He was discharged on 11/06/14, after a hospitalization for "homicidal thoughts." He was hospitalized again on 04/07/15 for "suicidal ideation" with a plan. It was noted he was experiencing increased life stressors at that time (e.g., "not being recommended to become a pilot, Article 15 for disrespect" and a significant argument with his wife). [Defendant] was then hospitalized from 06/23/15 to 06/30/15 for "worsening depression and possible hanging attempt." Finally, he was hospitalized on 07/10/15 for "HI [homicidal ideation] with a plan. Again, increased life stressors (e.g., pending chapter separation from the army) were noted.

(*Id.* at 11-12.)

9

Dr. Sharf then reviewed the medical records from St. Vincent Hospital and Massachusetts General Hospital. The St. Vincent Hospital records indicated Defendant arrived at the hospital on October 12, 2021 with burns on his body and he "present[ed] with agitation" and "strange behavior as witnessed by bystanders or family," including that he was observed "running around upstairs agitated" and had to be brought to the emergency department by security. (*Id.* at 12; Ex. C at 21.) St. Vincent Hospital records also noted Defendant had an altered mental status, appearing "delirious," with "manic" affect and that "delusions/hallucinations are present." (Dkt. No. 133 at 12; Ex. C at 29.) Dr. Sharf noted that an involuntary psychiatric evaluation under Mass. Gen. Laws ch. 123, § 12 was initiated and Defendant was transferred to Massachusetts General Hospital's burn unit. Defendant's "diagnoses were listed as: burn of second degree of foot, burn of second degree of back of right hand, burn of second degree of abdominal wall, unspecified psychosis not due to a substance or known physiological condition." (Dkt. No. 133 at 12.)

At Massachusetts General Hospital, Defendant was hospitalized from October 12, 2021 to October 22, 2021. "Upon arrival, [Defendant] was noted to evidence slow speech and flat affect"; he was also "described as guarded about the precipitating incident and vague when answering questions." (*Id.*) In addition, Defendant "initially refused to interact with psychology or psychiatry staff" and did not permit them to contact his wife. (*Id.*) However, hospital admission records note:

> Wife reports that patient has been hospitalized psychiatrically as recently as June 2021. He had been under a lot of stress and was acting inappropriately, laughing at inappropriate things, spacing out and talking to himself and not sleeping. The wife reports that the patient started acting like this 2 days ago.

(*Id.*; Ex. B.) Dr. Sharf noted that "a diagnostic impression of 'brief psychotic disorder' was noted in the records from 07/20/21, though no additional details of the hospitalization were described in the available records." (Dkt. No. 133 at 12.)[6] Eventually, Defendant permitted hospital staff to contact

---

[6] Dr. Sharf did explain that "St. Vincent Hospital records indicated [Defendant] presented to the hospital on 06/29/21," but it was for a complaint of a headache after Defendant received a COVID vaccination the previous day and

his wife, who denied her previous statements about Defendant's odd behaviors and expressed no

safety concerns. The section 12 involuntary hospitalization was then discontinued and Defendant

was released.

Dr. Sharf then discussed Defendant's presentation and behavior after arriving at FMC

Butner on January 2, 2024. She explained that Defendant "presented as uncooperative with the

forensic intake," and "[h]e was observed pacing in the secured cell in R&D (he was reportedly

uncooperative with the US Marshals during the flight)." (*Id.* at 13.) When Dr. Sharf first met

Defendant, "he looked past [her] and did not make eye contact. He was observed muttering

something under his breath, though it was not clear what was being said, and blinking forcefully."

(*Id.*) Ultimately, "[a]ttempts to engage him in the forensic intake were unsuccessful." (*Id.*) Dr. Sharf

explained that Defendant

> presented similarly throughout the duration of the evaluation period. That is, he
> typically refused to acknowledge or speak with psychology or psychiatry staff. He was
> generally observed either pacing his assigned cell without making eye contact or resting
> on his bed underneath the blankets. He was not receptive to staff attempts to engage
> him, including knocking loudly on the door, calling his name, or asking him questions.

(*Id.*) In addition, Defendant "declined to participate in mental health treatment throughout his

hospitalization" and "did not respond to staff's request to participate in an interview or consider

taking psychotropic medication." (*Id.*) Although Defendant did attend the first three sessions of his

competency restoration group, "he was generally not attentive or engaged during group sessions"

and "only verbally spoke when it was time for him to be escorted back to his cell or to make

requests (e.g., asked for a jacket with a working zipper, asked for a shower)." (*Id.*) Moreover,

Defendant "did interact briefly with other staff over the course of the evaluation period," for

example, asking "about obtaining additional food or moving to an open population." (*Id.* at 14.) But

---

Defendant was discharged that same day. (*Id.*)

when Dr. Sharf "attempted to speak with [Defendant] about these concerns, he did not engage."

(*Id.*)

Based on the available information, Dr. Sharf assigned Defendant the following diagnoses: unspecified schizophrenia spectrum or other psychotic disorder; and other specified personality disorder, antisocial features. (*Id.*) Dr. Sharf explained:

> Psychotic disorders are defined by abnormalities in one or more of the following five domains: delusions (fixed beliefs that are not amenable to change in light of conflicting evidence); hallucinations (perception-like experiences that occur without an external stimulus); disorganized thinking (speech); grossly disorganized or abnormal motor behavior (including catatonia); and negative symptoms (such as diminished emotional expression and avolition).

(*Id.*) In this regard, she noted that "[r]ecords indicate [Defendant] has presented with symptoms that could be indicative of a psychotic disorder," including that Defendant "evidenced bizarre behavior, appeared distractible, related oddly, demonstrated flat affect, and displayed oddities in his speech." (*Id.*) Dr. Sharf continued: "Despite the presence of rigid thinking and odd behavior, [Defendant] does not appear to meet the full criteria for schizophrenia, as there is limited information regarding whether or not he has experienced hallucinations and/or delusions." (*Id.* at 15.) Dr. Sharf also acknowledged "it is difficult to discern the severity of his current psychotic symptoms to obtain a full understanding of current thought process," because of Defendant's "unwillingness to participate in interviews to obtain more information." (*Id.*) Accordingly, Dr. Sharf opined that a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder "is most appropriate" "at this time," since "[t]his category applies to presentations in which symptoms characteristic of a schizophrenia spectrum and other psychotic disorder that cause clinically significant distress or impairment in social, occupations, or other important areas of functioning predominate" but still "do not meet the full criteria for any of the disorders in the schizophrenia spectrum and other psychotic disorders diagnostic class." (*Id.*)

Dr. Sharf then explained that Defendant's "history is also consistent with other personality disorder, specifically antisocial features." (*Id.*) She noted that

> antisocial personality disorder is categorized by a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood. Diagnostic criteria for antisocial personality disorder also includes a failure to conform to social norms with respect to lawful behaviors. Individuals with antisocial personality disorder are frequently deceitful and manipulative in order to gain personal profit or pleasure. They may repeatedly lie, use an alias, con others, or malinger. A pattern of impulsivity may be manifested by spur of the moment decision-making, without forethought and without consideration for the consequences to self or others. They tend to be irritable and aggressive and may repeatedly get into physical fights or commit acts of physical assaults.

(*Id.*) Dr. Sharf opined that "[c]ollateral records suggest a history of aggressive and assaultive behavior (e.g., hospitalizations related to homicidal ideation), deceitfulness (e.g., receiving incident reports for lying or falsifying statements), impulsivity, and irresponsibility." (*Id.*) As noted by Dr. Rigsbee, however, a full diagnosis of antisocial personality disorder requires the existence of "conduct disorder" prior to the age of 15, and, "[g]iven the dearth of information provided by [Defendant] and the only available records being limited to adulthood," little is known about his pattern of behavior as a child or in adolescence. (*Id.* at 15-16.)

As to competency, Dr. Sharf opined that "there is no evidence to suggest [Defendant's] factual understanding of courtroom proceedings is impaired" and noted his prior experience with court proceedings. (*Id.* at 16.) However, she questioned "his rational understanding of the charges against him and his ability to assist and work with a defense attorney." (*Id.*) Dr. Sharf explained that Defendant "has previously demonstrated a lack of understanding regarding the status of his case (e.g., repeatedly asserting he has already pleaded guilty)," and "[h]e also perseverated on seemingly irrelevant information (e.g., his desire to obtain a divorce) during the prior court hearing." (*Id.*) "Most concerning," Dr. Sharf explained, was that Defendant "was not receptive to attempts to educate him about these issues," "[d]espite being gently challenged on his beliefs and being provided education by the Court on multiple occasions." (*Id.*) "Such rigid and inflexible thinking will likely

make it difficult to rationally participate in court proceedings and work towards his defense." (*Id.*) Dr. Sharf also noted that Defendant's "odd behavior" during the evaluation period "was particularly concerning," as he "was typically observed pacing aimlessly back and forth in his assigned cell with a blank stare on his face." (*Id.*) Moreover, Defendant "did not appear to engage in goal-directed behavior throughout the evaluation period." (*Id.*) "For example, he would periodically ask custody staff if he could move to open population," but when Dr. Sharf "would attempt to speak with him further about this in order to grant his request, he would not respond." (*Id.*) Ultimately, Dr. Sharf opined that Defendant "is currently suffering from a mental disease or defect, which renders him not competent to stand trial." (*Id.*)

However, Dr. Sharf stated her "opinion, in consultation with the treatment team, that a substantial probability exists that [Defendant's] competency to stand trial can be restored with appropriate treatment with antipsychotic medicine." (*Id.* at 17.) She explained that "less intrusive methods of treatment, such as psychotherapy, are not likely to restore his competency." (*Id.*) Since Defendant "has refused to accept recommended medication treatment on a voluntary basis," Dr. Sharf requested "the court order treatment with psychotropic medication on an involuntary basis" and offered to "submit an Addendum to the Forensic Evaluation which will outline in detail our proposed treatment plan and further details pertinent to the" factors under *Sell v. United States*, 539 U.S. 169 (2003).[7]

D.  The Government's *Sell* Request

On May 16, 2024, the government filed a motion requesting an order for an addendum to

---

[7] Dr. Sharf also addressed the possibility of involuntary medication under the standard articulated in *Washington v. Harper*, 494 U.S. 210, 227 (1990) (holding that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."). She explained that Defendant "has been free from aggressive or self-destructive behavior since his arrival at FMC Butner," and "[h]e has not engaged in behavior which would pose a high risk of danger to himself or others" in that setting. (*Id.*) Therefore, Dr. Sharf and the treatment team opined that Defendant "does not meet *Harper* criteria for involuntary treatment insofar as he is not gravely disabled nor does he present an imminent risk of danger to himself or other in the hospital setting." (*Id.*)

the Forensic Evaluation to address the *Sell* factors and outline a proposed treatment plan. (Dkt. No. 135.) The court held a status conference the following day and allowed the government's motion. (Dkt. No. 136.)

On July 2, 2024, FMC Butner submitted a Forensic Addendum completed by Charles A. Cloutier, M.D., a Staff Psychiatrist, in response to the court's order. (Dkt. No. 140.) Dr. Cloutier's report listed Defendant's diagnosis as unspecified schizophrenia and other psychotic disorder. (*Id.* at 1.) He reported that Defendant "remains mute and withdrawn and does not appear to have any insight into his mental illness." (*Id.*) Although Defendant "has refused to come out of his cell to meet with care providers or attend recreation, he has maintained basic hygiene and has continued to eat and maintain hydration." (*Id.*) Dr. Cloutier opined that Defendant's "mutism and refusal to make eye contact or speak with staff suggests possible catatonia in context of a severe psychotic illness," and that "[c]urrently, [Defendant] is not able to rationally accept or decline psychiatric treatment." (*Id.*) Dr. Cloutier reported that Defendant "has not attended any psychoeducational groups." (*Id.*) However, "[a]lmost daily, he asks the unit officers for an extra food tray and/or to be moved to open population." (*Id.*) But "the officers note that he makes little if any eye contact, speaks in an odd manner, and consistently refuses to leave his cell." (*Id.*) Dr. Cloutier next reviewed the background information recounted in Dr. Rigsbee's and Dr. Sharf's reports. He also noted that "[r]ecords from St. Vincent Hospital, MGH, and Carl R. Darnall Army Medical Center show [Defendant] was given droperidol (for agitation) or haloperidol for apparent psychosis or 'as needed' for agitation (both are antipsychotic medications)." (*Id.* at 4.) However, "[t]here are no available records showing long term treatment with an antipsychotic medication." (*Id.*)

Dr. Cloutier proposed that Defendant be treated with haloperidol (Haldol), reasoning that Defendant "has a mental illness that is very likely to respond to antipsychotic medication." (*Id.*) Specifically, "[a] diagnosis of unspecified schizophrenia places him in a population of patients with

psychosis that can attain competency 70-80% of the time with antipsychotic medication." (*Id.*) Dr. Cloutier noted his proposal "is the recommended first line of treatment for schizophrenia according to the Clinical Practice Guidelines of the American Psychiatric Association," and "[t]here is no evidence to support psychotherapy alone being able to treat schizophrenia." (*Id.*) Dr. Cloutier cited a 2013 study[8] which reviewed the treatment outcomes of 132 defendants with various psychotic disorders who were involuntarily medicated with antipsychotic medication, under *Sell*, between June of 2003 and December of 2009, "with the majority (79%) improving sufficiently to be restored to competency status." (*Id.* at 5.) In particular, "[i]n defendants diagnosed with schizophrenia, 62 of 81 . . . (approximately 76%) were restored to competency status"; in defendants "diagnosed with schizoaffective disorder, 18 of 22 (81.8%) were restored to competency status"; and "[i]n defendants with a diagnosis of psychosis not otherwise specified . . . , 13 of 14 (92.9%) were restored to competency." (*Id.*)[9]

Dr. Cloutier acknowledged that "it is best to recommend medication which the patient has responded well to and tolerated in the past," but "there are no records available of any extended treatment with antipsychotic medication." (*Id.*) Moreover, Defendant's "poor insight into his mental illness, the number of years untreated, and sparse treatment history, all limit his chances of responding to antipsychotic medication." (*Id.*) However, Dr. Cloutier noted "positive prognostic factors include [Defendant's] age and recently some evidence of responding to haloperidol." (*Id.*) Dr. Cloutier explained that for patients with schizophrenia, "it is recommended to start with a second-generation antipsychotic medication such as risperidone (Risperdal) due to their relatively lower risk

---

[8] Robert E. Cochrane et al., *The Sell Effect: Involuntary Medication Treatment is a "Clear and Convincing" Success,* Law and Human Behavior (2013).

[9] Dr. Cloutier testified at the *Sell* hearing that psychosis not otherwise specified "would have included," at the time the Cochrane study was released, "the unspecified schizophrenia disorder and other psychotic disorders" which Defendant has been diagnosed with. (Dkt. No. 164 at 108.)

of side effects." (*Id.*) But because of Defendant's "lack of insight into his mental illness, [he] will require involuntary medication by intramuscular injection," and therefore, Dr. Cloutier recommended haloperidol, which is available in both short-acting and long-acting injectable formulations. (*Id.*) He explained that haloperidol "is an antipsychotic which is a class of psychiatric medication widely used in the treatment of psychosis in a variety of clinical settings including hospital emergency departments, psychiatric hospitals and outpatient mental health clinics," and "has been widely used in various clinical settings for decades and is often utilized in patients who do not respond to newer agents or have severe symptoms." (*Id.*) Dr. Cloutier proposed starting Defendant "on intramuscular injection of immediate/short acting haloperidol lactate at 3mg to see how he responds," and "[i]f it is tolerated without allergic reaction, then he [would] be given intramuscular injection of longer-acting haloperidol decanoate starting at a low dose of 50mg every 4 weeks with target dose range of 50-to-100mg every 2-to-4 weeks." (*Id.*)

Dr. Cloutier further explained that "[t]he benzodiazepine, lorazepam, might also be necessary to treat symptoms of possible catatonia," which "is a behavior syndrome that can occur in patients who are ill with an underlying psychiatric disorder such as a severe mood or psychotic disorder." (*Id.*) Dr. Cloutier opined that "some signs of mild catatonia appear evident, including his mutism and odd behavior; however, since he is getting up and walking around his cell daily and he is maintaining adequate intake of food, this behavior may be primarily due to his untreated psychosis." (*Id.*) He then stated: "If lorazepam is used in this context, it is given . . . by intramuscular injection at 2mg two to three times a day." (*Id.*)

Next, Dr. Cloutier explained that "[a]s symptoms decrease and compliance and insight improve, then oral formulations of antipsychotic medication, including those with lower side-effects, can be considered, starting with risperidone," the second-generation medication. (*Id.* at 6.) "Other possible medications include aripiprazole and paliperidone, both of which are available in oral and

long-acting injectable formulations." (*Id.*) Dr. Cloutier further recommended, "if needed, adjunctive treatment (anticholinergics, benzodiazepines) to manage any side effects," and noted that "[a]dding an additional antipsychotic, a benzodiazepine, or a mood stabilizing agent, might also be necessary to augment his treatment." (*Id.*)

Dr. Cloutier predicted there would be "[a] decrease in [Defendant's] symptoms of mental illness and an increase in functioning" with the involuntary treatment. (*Id.*) After "signs and symptoms of psychosis wane, then [Defendant] will be able to actively participate in his treatment including competency restoration groups." (*Id.*) Regarding the risks of haloperidol, "[t]he most probable side effects . . . are neuromuscular and include extrapyramidal syndrome (EPS; mild shaking or tremor, or brief episodes of muscle tightness or spasm [dystonia], as well as restlessness known as akathisia)." (*Id.*) "There is also a very low risk of very serious side effects, including sudden cardiac death." (*Id.*)[10] Dr. Cloutier explained that "[i]f involuntary medication is ordered," he "would mitigate these risks by medical evaluation (labs, EKG, etc.) and careful observation," as well "adjunctive medications if necessary," and by keeping Defendant "on the lowest effective dose possible." (*Id.*) Ultimately, based on Defendant's psychiatric history, Dr. Cloutier opined that Defendant "will likely require four . . . to eight . . . months of treatment with antipsychotic medication" to restore his competency. (*Id.*)

On July 26, 2024, the government filed a Motion for Involuntary Administration of Antipsychotic Medications and *Sell* Hearing. (Dkt. No. 144.) The government requested that the court hold an evidentiary hearing and ultimately issue an order directing BOP to administer antipsychotic medication in accordance with Dr. Cloutier's treatment plan. The motion addressed the four *Sell* factors and relied on both Dr. Sharf's and Dr. Cloutier's reports. On July 30, 2024, the

---

[10] For the second-generation antipsychotics, "the more common side effects are weight-gain with or without elevations in blood glucose and/or cholesterol." (*Id.*)

court held a status conference, during which it set a deadline for Defendant's response (through

Attorney O'Connor) and scheduled an evidentiary hearing for October 3, 2024. (Dkt. Nos. 146,

147.) On September 23, 2024, the court held another status conference and addressed Defendant's

motion to continue. (Dkt. No. 156.) The court explained that it had been notified that Defendant

would not be transferred in time for the October 3, 2024 hearing, so it continued the *Sell* hearing.

The court also extended the deadline for Defendant's opposition brief, which was filed on October

15, 2024. (Dkt. No. 159.)

    In addition, the court received notification that the government commenced civil

commitment proceedings against Defendant by filing a Certificate of Mental Disease or Defect and

Dangerousness, under 18 U.S.C. § 4246, in the Eastern District of North Carolina on September 13,

2024. *United States v. Charrette*, 24-hc-02164-D (E.D.N.C.) (Dkt. No. 1). The Certificate states that

Defendant, who is housed at FMC Butner, "has undergone a psychiatric evaluation pursuant to Title

18 U.S.C. § 4246(a)," and "[t]he FMC-Butner forensic staff believe that [he] is currently suffering

from a mental disease or defect as a result of which his release would create a substantial risk of

bodily injury to another person or serious damage to the property of another." *Id.* On September 18,

2024, United States District Judge James C. Dever III granted the government's request to stay the

civil commitment proceedings pending this court's adjudication of the forced-medication and

competency issues. *Id.* (Dkt. No. 8.)

E.  The *Sell* Hearing

    On October 31, 2024, the court held the *Sell* hearing, at which Dr. Sharf and Dr. Cloutier

testified remotely. Defendant was physically present in the courtroom. At the start of the hearing,

when Attorney O'Connor introduced himself and stated whom he was representing, Defendant

responded: "No, you're not. I'm self-appointed; I already told you before." (Dkt. No. 164 at 3.)

Defendant then asked if would be sentenced that day, and after the court stated that he would not

and explained the nature of the hearing, Defendant placed his fingers inside his ears, faced his body away from the testimony and the court, and generally refused to participate or interact with the court or appointed counsel.

Dr. Sharf testified as to her educational and work background and the records she reviewed. She described her attempts to engage with Defendant and his strange behavior—blank stares and pacing in his cell, but never any responses. Dr. Sharf also pointed to Defendant's forceful blinking and theorized he could have been distracted by internal stimuli. Dr. Sharf opined that this behavior is symptomatic of a psychotic disorder and that "antipsychotic medication would help move him towards becoming competent." (*Id.* at 19.) Moreover, Dr. Sharf explained that a more detailed diagnosis—beyond unspecified schizophrenia spectrum or other psychotic disorder—was not necessary because all psychotic disorders respond to similar treatment. Dr. Sharf explained that there was no indication in Defendant's medical records as to why haloperidol was prescribed or how often, to what extent, or if Defendant took any such antipsychotic medications in the past. As for the other specified personality disorder, antisocial features diagnosis, Dr. Sharf explained there was no treatment, as it entailed characterological traits. Although she saw some indications of antisocial behavior in Defendant's record, Dr. Sharf observed Defendant's behavior to be more extreme than typical antisocial personality disorder behavior. Nevertheless, she acknowledged that "it's important, for purposes of determining whether or not to force somebody to take medication, to be certain as to which of those two disorders [Defendant] suffers from," and that she could not rule out that Defendant's behavior at the hearing was caused by antisocial personality disorder, rather than a psychotic disorder. (*Id.* at 25.) Dr. Sharf recognized that Defendant engaged in some similar behavior during his evaluation period with Dr. Rigsbee, but she opined Defendant was experiencing more severe psychotic symptoms during the most recent evaluation period and that "he's decompensated." (*Id.* at 66.)

Dr. Cloutier testified next. After he described his educational and work background, Defendant interrupted the testimony and stated: "somebody clamped my bladder through my Neuralink trans[mitter]."[11] (*Id.* at 70.) Defendant was then permitted to use the restroom and Dr. Cloutier's testimony resumed shortly thereafter.

Dr. Cloutier testified he agreed with Dr. Sharf's diagnosis of unspecified schizophrenia spectrum or other psychotic disorder, and he opined "[t]hat antipsychotic medication is necessary to treat his condition if he is going to be restored to competency." (*Id.* at 73.) Dr. Cloutier explained that, beyond antipsychotic medication, "there are other medicines that we use either to address side effects or other aspects of the condition, particularly this level of negativistic or disengagement is concerning for catatonia," which "can definitely occur with the psychotic disorder." (*Id.* at 74.) Catatonia "is a condition where there is a profound disengagement or lack of any interaction with caregivers," and "[i]t can involve very odd behavior . . . , but usually it's someone who is just very withdrawn, does not interact with staff, does not want to really do much." (*Id.*) Dr. Cloutier explained that catatonia "tends to occur more with mood disorders . . . , but it definitely can occur with schizophrenia." (*Id.* at 75.) The treatment for catatonia, he explained, "would be a sedative called lorazepam." (*Id.* at 74)

As for the antipsychotic medication, Dr. Cloutier testified that haloperidol is the only "feasible" option. (*Id.* at 76.) He explained its side effects include sedation, tremors, and muscle stiffness or decrease in motor activity, but that he tries "to avoid that by starting at a very low dose and only advancing the dose upon clinical picture." (*Id.*) Moreover, Dr. Cloutier explained, some side effects can be managed by a medication called Cogentin or benztropine. Nevertheless, over time, a particular side effect can develop—tardive dyskinesia, which "involves . . . involuntary

---

[11] The transcript records Defendant as saying "Neuralink transceiver," but the court's recollection—and that of the government on the record directly following the incident—is that Defendant said "Neuralink transmitter." (*Id.* at 71.)

random movements of the lips tongue, and fingers." (*Id.* at 76-77.) The risk of tardive dyskinesia "accumulates," meaning the longer an individual takes the medication, the more likely he will develop this condition, which can be permanent. (*Id.* at 77.) Nevertheless, Dr. Cloutier opined that the risk of developing tardive dyskinesia in the context of competency restoration "is low." (*Id.*)[12]

Dr. Cloutier testified that, if the court were to order involuntary administration of antipsychotic medication, he would first offer Defendant a "newer generation of medicines," which can be taken orally. (*Id.* at 78) However, if Defendant does not agree, he would be given an intramuscular injection of short-acting haloperidol. Defendant would then be assessed to see "how he responds before giving the long-acting injection, which lasts two to four weeks." (*Id.*) Dr. Cloutier also testified that "with the first dosing, if there's agitation, we may give lorazepam," and "[i]f there are any side effects, we give an anticholinergic medicine which counterbalances the haloperidol." (*Id.* at 79.) That anticholinergic medicine, Congentin, itself can have side effects, including dry mouth and constipation, but it is given at low doses. These side effects, Dr. Cloutier explained, would not interfere with Defendant's ability to engage with his attorney.

With regard to lorazepam, Dr. Cloutier testified it could be administered, also by injection, "either for agitation or catatonia." (*Id.* at 81.) When asked if catatonia is "something that you have diagnosed [Defendant] with or is this something that you are watching out for," Dr. Cloutier testified:

> Well, it is something that has been considered. And we do watch out for it because, looking back at his previous behavior at Devens and certainly how he was behaving here, and . . . what you've seen today, I am concerned that there may be catatonia as part of the picture. That would only mean that I would start with lorazepam before haloperidol.

---

[12] In addition, Dr. Cloutier testified as to other severe side effects, such as "neuroleptic malignant syndrome and sudden cardiac death" but explained these are "extremely rare." (*Id.* at 133.)

(*Id.*) Dr. Cloutier explained that "[w]ith catatonia, there's a paradoxical response to lorazepam where patients tend to increase in their activity and engagement rather than become sedated and subdued." (*Id.* at 86.) He further explained that it is important, "if catatonia is part of the picture," to address it first because catatonia "can be worsened by antipsychotic medications." (*Id.* at 87.) Accordingly, the treatment team would start with an injection of lorazepam "to see if there's a response within hours and days" and "then proceed to the antipsychotic." (*Id.*)

Dr. Cloutier testified that, with haloperidol, Defendant would likely see "incremental improvements," but "it can take up to two months to really see . . . to what extent the medicine is working," and "because there's a wide range . . . I'm thinking many months." (*Id.* at 88.) He continued: "We look at around four to eight months and then hopefully it is sooner, but . . . that's sort of the longest we would hope it would take, would be four to eight months." (*Id.*) After reaching the appropriate dosage level, Defendant would need to maintain that dosage through the time of his trial to maintain competency.[13] Dr. Cloutier opined that "it is likely [Defendant] will respond" to the haloperidol. (*Id.* at 90.) He explained: "Relatively speaking, [Defendant] is young and it sounds like he's sort of in the early . . . phase of a major psychotic disorder." (*Id.* at 90-91.)[14] Dr. Cloutier also referenced the Cochran study he cited in his report and stated the figures from that study comport with his "own experience with treating psychotic disorders." (*Id.* at 91.) Dr. Cloutier further testified that the administration of haloperidol is in Defendant's "best medical interest in light of his medical condition." (*Id.* at 92.)

---

[13] Dr. Cloutier also requested that the court permit him to use discretion in adjusting dosages and medication.

[14] On cross-examination, however, Dr. Cloutier conceded that Defendant's psychosis "could potentially have gone back" to his hospitalizations at the Darnall Army Medical Center in 2015. (*Id.* at 116.) If that was the case, then this increased number of years untreated would mean Defendant was "less likely [to have] a positive response" to the medication. (*Id.*)

On cross-examination, Dr. Cloutier testified that the Massachusetts General Hospital records show Defendant was given 5 mg of haloperidol intravenously on October 19, 2021, but Dr. Cloutier believed it was for agitation and "not for initiating a treatment of psychosis." (*Id.* at 95-96.) Although Dr. Cloutier attempted to speak with Defendant on twelve different occasions, Defendant never engaged, so neither he nor the medical team could conduct psychological testing or interviews, which are helpful in making a diagnosis. Nevertheless, even without this information, Dr. Cloutier was still able to observe Defendant's behavior, explaining: "his behavior is not normal. He is mentally ill. He is very odd . . . . [Y]et that information is still gleaned, even though he hasn't said a word." (*Id.* at 98.)[15] Dr. Cloutier also pushed back on the assertion that Defendant "was routinely talking to other staff." (*Id.* at 99.) Instead, Dr. Cloutier explained that, based on his conversations with the other staff, Defendant rarely spoke, except "every now and then he'll just say, 'Am I going to go to open pub?' But then does not follow up with any other words. Or he may ask for an extra tray, but there's no conversation." (*Id.*)

Dr. Cloutier explained that when he wrote his report, he did not "have a firm belief that [Defendant is] experiencing catatonia," but his opinion changed based on Defendant's behavior at the hearing, such that "it is prudent and in [Defendant's] best medical interest to start with just a lorazepam injection to see . . . how he responds to a course of that treatment in case he has catatonia and it is more prominent than anticipated or recognized." (*Id.* at 101.) Still, Dr. Cloutier explained, catatonia was "[n]ot the core diagnosis that [he] listed on the proposed treatment plan"; rather, the unspecified schizophrenia or other psychotic disorder is "the core mental illness from which patients can exhibit catatonic behavior and develop full catatonia." (*Id.* at 102.)[16] As for the prior diagnoses

---

[15] Dr. Cloutier explained at the hearing that "[t]oday was the first time I've ever heard him speak." (*Id.* at 98.)

[16] Accordingly, Dr. Cloutier opined that treating Defendant only with lorazepam for catatonia would likely not be sufficient to restore his competence. (*Id.* at 104.)

of mood disorders, Dr. Cloutier acknowledged that Defendant "may have a mood disorder, but it's probably more what we call schizoaffective disorder, which is still a primary psychotic disorder with a mood component." (*Id.* at 103.) Even if Defendant does have a mood disorder, Dr. Cloutier explained, he "is going to require an antipsychotic because he's having psychotic symptoms, as we've witnessed today." (*Id.* at 105.) In particular, Dr. Cloutier pointed to Defendant's statement "about his bladder being pinched by a Neuralink," which was "an odd, bizarre statement that sounds like a delusion or a somatic hallucination or a mix of the two." (*Id.*) When asked by the court whether Defendant's fixation on the belief that he already pled guilty was "more consistent with a psychosis or a personality disorder," Dr. Cloutier testified that he was "just not sure," as "it is difficult to tease the two apart because they can and often -- and here, we do see a lot of folks that have both a lifelong maladaptive pattern of interacting with the world, along with a severe persistent mental illness like psychotic disorder." (*Id.* at 143.)

Special Agent Michael Finnerty, the case agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, testified next as to the incident underlying the charges against Defendant, and the government introduced a number of exhibits, including the videos surrounding the fire at China City. During Special Agent Finnerty's testimony, Defendant objected and, after declining to discuss the matter with Attorney O'Connor, stated: "The restaurant in question is China Star. . . . It is not China City. China Star. . . . I burned out China Star." (*Id.* at 146-47.) Special Agent Finnerty testified that, although the owners of the strip mall received an insurance payout for the damage to the building, the business owners of China City itself did not have any insurance to cover the losses arising out of the business closure after the fire.[17]

---

[17] Moreover, Special Agent Finnerty testified that, based on his experience, insurance companies frequently request restitution from a person convicted of causing the damage that necessitates an insurance payout.

On November 8, 2024, the court heard oral arguments on the government's *Sell* request. (Dkt. No. 166.) During the course of the government's argument, Defendant interrupted to ask whether he would be sentenced that day. The court explained that Defendant has not been found or pled guilty, so there would be no sentence at that time. When the court asked Defendant if he accepted that explanation, Defendant did not respond.

III.    ANALYSIS

In *Sell*, the Supreme Court set forth the standard for determining whether a criminal defendant may be involuntarily medicated with antipsychotic drugs in order to render him competent to stand trial. *Sell*, 539 U.S. at 177-181. The Court explained that "an individual has a 'significant' constitutionally protected 'liberty interest' in avoiding the unwanted administration of antipsychotic drugs." *Id.* at 178 (quoting *Harper*, 494 U.S. at 221). After all, "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Harper*, 494 U.S. at 229. "In the case of antipsychotic drugs . . . , that interference is particularly severe," since "'[t]he purpose of the drugs is to alter the chemical balance in a patient's brain.'" *Riggins v. Nevada*, 504 U.S. 127, 134 (1992) (quoting *Harper*, 494 U.S. at 229). As a result, the government may only forcibly medicate a defendant when an "essential" or "overriding" governmental interest is at stake. *Sell*, 539 U.S. at 179 (quoting *Riggins*, 504 U.S. at 134).

The government's interest in rendering a defendant competent to stand trial may suffice to overcome a defendant's liberty interest in avoiding forcible medication, "[b]ut those instances may be rare." *Id.* at 180. In particular, the government must demonstrate by clear and convincing evidence[18]: (1) important governmental interests are at stake; (2) involuntary medication will

---

[18] Although the First Circuit has not addressed the burden of proof, other courts within the First Circuit and other circuits have held that the clear and convincing standard applies. *See, e.g., United States v. Vigeant*, 2012 WL 3064410, at *3 (D. Mass. Apr. 18, 2012) (collecting cases). The government does not argue otherwise.

significantly further those interests; (3) involuntary medication is necessary to further those interests; and (4) administration of the medication is medically appropriate. *Id.* at 180-81.

As to the first prong, "a court must find that *important* governmental interests are at stake." *Id.* at 180. Generally, "[t]he Government's interest in bringing to trial an individual accused of a serious crime"—including "a serious crime against the person or a serious crime against property"—is considered important. *Id.* Nevertheless, the Supreme Court explained, courts "must consider the facts of the individual case," including whether any "[s]pecial circumstances may lessen the importance" of the government's interest in prosecution. *Id.* For example, "[t]he defendant's failure to take drugs voluntarily . . . may mean lengthy confinement in an institution for the mentally ill," which "would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* Although a civil commitment is not "a substitute for a criminal trial," "[t]he potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution." *Id.* "The same is true," the Supreme Court explained, "of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, see 18 U.S.C. § 3585(b))." *Id.* In addition, the government "has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one." *Id.*

Here, the court concludes that Defendant has been charged with a "serious crime." Courts often look to the maximum statutory penalty for the offense as well as the conduct underlying the charged offense in determining whether a crime is "serious" for *Sell* purposes. *See United States v. Fieste*, 84 F.4th 713, 720 (7th Cir. 2023); *United States v. Berry*, 911 F.3d 354, 360, 363 (6th Cir. 2018); *United States v. White*, 620 F.3d 401, 411-12 & n.7 (4th Cir. 2010); *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007); *United States v. Vigeant*, 2012 WL 3064410, at *4 (D. Mass. Apr. 18, 2012); *United States v. Rashid*, 2023 WL 8111833, at *3 (S.D. Fla. Nov. 21, 2023). The offense of

damage and destruction of a building or personal property by means of fire in violation of 18 U.S.C. § 844(i) carries a maximum penalty of twenty years of incarceration and a mandatory minimum sentence of five years of incarceration. This is well beyond the penalty range courts have considered serious. *See, e.g.*, *White*, 620 F.3d at 411 ("[W]e have held that a crime is 'serious' for involuntary medication purposes where the defendant faced a ten-year maximum sentence for the charges against him."). In addition, the conduct underlying the charge—dousing a restaurant, after hours, in gasoline and causing a large explosion—is undoubtedly violent, upsetting, and extremely serious.

Despite the serious nature of the charged offense, the court must also consider whether any "special circumstances" weaken the government's interest in the prosecution. *Sell*, 539 U.S. at 180. The court finds that the two examples provided in *Sell*—the likelihood of lengthy civil commitment, and a significant period of pretrial confinement—substantially reduce the government's interest in proceeding with the prosecution here. First, Defendant is not facing the mere possibility of civil commitment proceedings; rather, civil commitment proceedings have already begun in the Eastern District of North Carolina and have been stayed pending this court's decision. *Compare United States v. Mikulich*, 732 F.3d 692, 699 (6th Cir. 2013) ("The record before us shows nothing beyond complete uncertainty as to whether Mikulich would face civil commitment under either federal or state law."); *Vigeant*, 2012 WL 3064410, *4 ("While a civil commitment proceeding is theoretically possible, the present record does not support the conclusion that such a commitment is likely."); *United States v. Goforth*, 2023 WL 6812036, at *1 (D. Mass. Oct. 16, 2023), *with Berry*, 911 F.3d at 365 ("[W]hile the mere uncertain possibility of civil commitment is not enough, neither is there a requirement that the defendant must prove that civil commitment is a certainty."); *United States v. Grigsby*, 712 F.3d 964, 972 (6th Cir. 2013).

Moreover, the court believes it is likely Defendant will be civilly committed under 18 U.S.C. § 4246 for the foreseeable future. Under 18 U.S.C. § 4246(a),

> If the director of a facility in which a person is hospitalized certifies that a person in the custody of the Bureau of Prisons whose sentence is about to expire, or who has been committed to the custody of the Attorney General pursuant to section 4241(d), or against whom all criminal charges have been dismissed solely for reasons related to the mental condition of the person, is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available, he shall transmit the certificate to the clerk of the court for the district in which the person is confined.

18 U.S.C. § 4246(a). The filing of the certificate operates to "stay the release of the person pending completion of" the civil commitment procedures. *Id.* Ultimately, the civil commitment court will hold a hearing to determine if "the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(d). If the court so finds, the person is then committed to the custody of the Attorney General for hospitalization in a suitable facility, unless arrangements can be made for an appropriate state official to assume responsibility for the person's care, custody, and treatment. *Id.* The hospitalization would continue until "(1) such a State will assume such responsibility; or (2) the person's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another." *Id.* Given the behavior Defendant has displayed while incarcerated (including refusing mental health treatment) and during court hearings, the disturbing nature of the alleged criminal conduct in Massachusetts and Texas, and Defendant's extensive history of mental health issues, it is likely that the civil commitment court will find Defendant's "release would create a substantial risk of bodily injury to another person *or serious damage to property of another.*" 18 U.S.C. § 4246(d) (emphasis added). *See Berry*, 911 F.3d at 365; *Grigsby*, 712 F.3d at 972; *United States v. Ryan*, 441 F. Supp. 3d 574, 585-86 (M.D. Tenn. 2020).

This court recognizes that "civil commitment is [not] a substitute for a criminal trial." *Sell*, 539 U.S. at 180. For example, as the government argued, a civil commitment—unlike a criminal conviction—does not include a period of supervised release. *See Fieste*, 84 F.4th at 726-27; *Rashid*, 2023 WL 8111833, at *4, 9. On the other hand, the civil commitment statute does include, as an option, a "conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment" which is certified by the director of the facility and found by the civil commitment court to be appropriate. 18 U.S.C. § 4246(e). Moreover, the conditional release may be revoked if the medical director of the facility responsible for administering the regimen of treatment notifies the Attorney General and the court "of any failure of the person to comply with the regimen." 18 U.S.C. § 4246(f). Upon such notice or probable cause to believe the person has failed to comply with the regimen, the court then holds a hearing to determine whether the conditionally released person should be "remanded to a suitable facility on the ground that, in light of his failure to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another." *Id.* Accordingly, although not the same as supervised release, the civil commitment statute provides for some level of ongoing supervision of treatment following a conditional release.

The court must also consider the interests of the victims of Defendant's alleged criminal conduct. Unlike criminal proceedings, civil commitment proceedings include no provisions relating to victims' rights. *Compare* 18 U.S.C. § 3771. Moreover, there is no potential for restitution of victims in the civil commitment context. Here, in addition, the China City restaurant owners submitted a letter to the court expressing safety concerns. (Ex. J.) These considerations are important and demonstrate there are governmental and societal benefits to criminal prosecution which extend beyond immediate incarceration of the alleged perpetrator. Nevertheless, the court finds that the

significant likelihood that Defendant will remain in custody for the foreseeable future undermines (but does not completely overcome) the government's and the victim's primary interest in safety.

Second, Defendant's significant period of pretrial confinement also reduces the governmental interest in the prosecution here. Although courts generally "use the statutory maximum sentence in determining whether the government has an important interest in prosecuting a defendant," most courts look to the actual length of a likely sentence when determining whether a significant period of pretrial confinement presents "special circumstances" that weaken the government's interest in the prosecution. *Berry*, 911 F.3d at 363; *see Grisby*, 712 F.3d at 972-73 ("[W]e must also examine whether the length of Grisby's confinement while the government attempts to restore his competency and prosecute him may approximate the length of any sentence of imprisonment he ultimately may receive if convicted. . . . This analysis required by the Supreme Court is entirely separate and distinct from determining at the outset whether the statutory maximum penalty for the crime objectively establishes the seriousness of the crime and the government's interest in prosecuting it, which is not in dispute here." (citation omitted)). The parties agree that Defendant has been in custody since November of 2021—over 37 months at this point. Dr. Cloutier testified it would likely take between four and eight months for the antipsychotic medication to restore Defendant's competence. The court finds, in light of Defendant's medical history, that it would take closer to eight months to fully restore Defendant's competency to the point where he could adequately understand and participate in criminal proceedings, assuming the medication is effective. A trial or guilty plea and then sentencing would likely take at least another two months, bringing Defendant's likely pre-sentencing confinement to at least 47 months.[19] If convicted, Defendant would be facing a 60-month mandatory minimum sentence. Thus, even under

---

[19] In addition, Defendant could and (through counsel) likely would exercise his right to an interlocutory appeal, which would add significantly more time to the court's estimates. *See White*, 620 F.3d at 414 & n.11; *Ryan*, 411 F. Supp. 3d at 583.

an optimistic timeframe, Defendant would have already served the vast majority of the minimum mandatory portion of a sentence this court ultimately imposes upon conviction. Defendant clearly could be sentenced longer, but he would receive credit for a "significant" portion of any sentence ultimately imposed, thus weakening the government's interest in this prosecution.[20] *Sell*, 539 U.S. at 180.

In light of these special circumstances, the court finds the government has not demonstrated, by clear and convincing evidence, that important governmental interests are at stake in this prosecution to such an extent as to outweigh Defendant's liberty interest in resisting forcible antipsychotic medication.

As to the other three *Sell* prongs, which address the medical efficacy of the proposed treatment, the court finds there is too much ambiguity as to Defendant's diagnoses and which condition or conditions are the cause of his competency-related issues.[21] Dr. Rigsbee diagnosed Defendant with other specified personality disorder, with antisocial features. Dr. Sharf agreed with this diagnosis but also provided an additional diagnosis of unspecified schizophrenia spectrum or other psychotic disorder. However, Dr. Sharf testified that "it's important, for purposes of determining whether or not to force somebody to take medication, to be certain as to which of those two disorders [Defendant] suffers from," and that she could not rule out that Defendant's behavior at the *Sell* hearing was caused by antisocial personality disorder, rather than a psychotic disorder. (Dkt. No. 164 at 25.) Dr. Cloutier, for his part, testified somewhat similarly when asked whether Defendant's fixation on the belief that he already pled guilty was "more consistent with a

---

[20] Defendant (through counsel) has asserted, and the government has not disputed, that the sentencing guidelines range is lower than the statutory mandatory minimum sentence of 60 months.

[21] The court credits and appreciates the testimony and work of Dr. Sharf and Dr. Cloutier in this case. The court finds they testified credibly and put forth extensive efforts, under difficult circumstances, in evaluating and attempting to work with Defendant to assess and restore his competency.

psychosis or a personality disorder," explaining that he was "just not sure" and "it is difficult to tease the two apart." (*Id.* at 143.) The experts agree that if Defendant's competency-related issues are driven by a personality disorder, rather than psychosis, then the proposed antipsychotic medication will not help to restore his competency. Dr. Cloutier also introduced a third potential diagnosis—catatonia—which requires treatment with lorazepam before the antipsychotic medication is administered. While the court appreciates that Dr. Cloutier was able to observe Defendant's behavior during the *Sell* hearing and adjust his treatment plan in accordance with those observations, the shifting nature of the specific treatment plan and Defendant's diagnoses over time do not instill this court with the necessary confidence to forcibly medicate Defendant with potentially risky drugs. *See White*, 620 F.3d at 421 (discussing "the ambiguity involved in medicating an individual with [the defendant's] particular medical condition").

As to the risks of haloperidol in particular, the most concerning side effects are sudden cardiac death and tardive dyskinesia. Although sudden cardiac death is extremely rare, tardive dyskinesia is more common, its likelihood accumulates over time, and it can be irreversible. Moreover, the symptoms of tardive dyskinesia and other movement disorders caused by haloperidol can interfere with a Defendant's ability to assist in his defense. *See Grigsby*, 712 F.3d at 975.

The record does contain some evidence that Defendant was given a dose of haloperidol intravenously at Massachusetts General Hospital in 2021, likely for agitation, and there are no indications that Defendant suffered an allergic reaction thereafter. But there is also no indication that Defendant has ever received haloperidol by injection for psychosis, much less that he had a positive response to such treatment. Dr. Cloutier cited Defendant's age and that "it sounds like he's sort of in the early . . . phase of a major psychotic disorder" as positive factors in favor of treatment with haloperidol. (Dkt. No. 164 at 90-91.) However, he conceded on cross examination that Defendant's psychosis "could potentially have gone back" to his hospitalizations at the Darnall

Army Medical Center in 2015, in which case Defendant is "less likely [to have] a positive response" to the medication. (*Id.* at 116.) The court finds the latter scenario is more likely, given Defendant's extensive and concerning medical and criminal history. Moreover, as Dr. Cloutier explained in his report, Defendant's "poor insight into his mental illness, the number of years untreated, and sparse treatment history, all limit his chances of responding to antipsychotic medication." (Dkt. No. 140 at 5.)

In the end, the court finds there are simply too many unanswered questions surrounding Defendant's medical condition(s) and likely response to the proposed treatment. In addition, the governmental interest in this prosecution is substantially weakened, in light of the likelihood of civil commitment and the significant period of pretrial confinement. The court concludes the government has not satisfied its burden "to warrant the extraordinary use of forcible medication to render [Defendant] competent to stand trial." *Grigsby*, 712 F.3d at 976; *see Berry*, 911 F.3d at 357 ("The drastic step of administering these powerful drugs to an unwilling criminal defendant should be taken rarely, and only when absolutely necessary to fulfill an important governmental interest, to avoid deprivation of the defendant's 'liberty . . . without due process of law.'" (quoting U.S. Const. amends V, XIV § 1)).

In light of this finding, the court also concludes that there is not "a substantial probability that in the foreseeable future [Defendant] will attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d). However, Defendant is still "subject to the provisions of section 4246" and shall remain detained pending adjudication of the civil commitment proceedings in the Eastern District of North Carolina. 18 U.S.C. § 4241(d); *see* 18 U.S.C. § 4246(a) ("A certificate filed under this subsection shall stay the release of the person pending completion of procedures contained in this section.").

IV.    Conclusion

For the foregoing reasons, the court DENIES the Government's Motion for Involuntary Administration of Antipsychotic Medication. (Dkt. No. 144.)

It is So Ordered.

  /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge